43 605
116 69
116 71

THE CENTRAL RAILROAD & BANKING COMPANY *et al.*, plaintiffs in error, *vs.* THE MAYOR AND COUNCIL OF MACON *et al.*, defendants in error, and the same parties *vice versa*.

1. In a contest as to the legal right and authority of the Central Railroad Company to lease the Macon & Western Railroad, the State not being a stockholder in either company, was not a proper party to a bill to enjoin the execution and consummation of the contract for the lease of the road, nor was the city of Macon a proper party to the bill.

2. Under the provisions of the charter of the Macon & Western Railroad Company, that company had the legal power and authority to lease its road to the Central Railroad & Banking Company of Georgia, and the latter company had the legal power and authority, under the provisions of the Act of 1852, to accept said lease as specified in the contract set forth in the record:

*Held*, That the Court below erred in granting the injunction prayed for in complainants bill.

Corporations.   State as party.   Before Judge ALEXANDER.   Chambers.   Bibb county.   June, 1871.

On the 25th of May, 1871, at Macon, Georgia, there was a meeting of the board of directors of the Macon & Western Railroad Company. A. J. White, its President, stated to the board that the meeting was touching the leasing of said road, and submitted for their action a paper in the following words:

"GEORGIA—

"This indenture, made the ...... day of ........., eighteen hundred and seventy-one, between the Macon & Western Railroad Company of the first part, and the Central Railroad & Banking Company of Georgia of the second part, both of said parties being corporations under the laws of the said State of Georgia.

"Whereas, by an Act of the Legislature of the State of Georgia, approved the twenty-second day of January, A. D., eighteen hundred and fifty-two, the said the Central Railroad & Banking Company of Georgia, was authorized to lease and work for such time, and on such terms as might be agreed on by the parties interested, the Southwestern Railroad and such other railroads as then connected or might hereafter connect with the Central Railroad, and the said the railroad companies, having or which might hereafter have railroads connecting with the Central Railroad, were authorized to lease their respective railroads to the said the Central Railroad & Banking Company of Georgia, for such term of time and on such other terms as they might deem best;

"And, whereas, the said the Macon & Western Railroad Company is one of the companies having a road which connects with the said the Central Railroad, and included in the terms of said Act;

"And, whereas, also, by the terms of the charter of the said the Macon & Western Railroad Company granted by the State of Georgia, said company is authorized and empowered to rent or farm out any part or the whole of its exclusive right of transportation on said railroad with the privil-

The Central Railroad Company *vs.* The M. and C. of Macon.

eges thereof to any individual or individuals or other company.

"Now this indenture witnesseth, that the said the Macon & Western Railroad Company, for and in consideration of the covenants, conditions and agreements hereinafter set forth, on the part of the said the Central Railroad & Banking Company of Georgia, to be performed and kept, hath demised, leased and to farm let, and by these presents, doth demise, lease and to farm let all the railroad of the said the Macon & Western Railroad Company, leading and running from Macon to Atlanta, in the said State of Georgia, in all its branches, as the same is now constructed, and with all the extensions thereof to other points which may hereafter be constructed, including the right of way, road-bed, depots, stations, warehouses, wells, cisterns, engines, cars, fixtures, machinery, and all property whatsoever, real and personal, connected with and appertaining to the said the Macon & Western Railroad, and owned by the said party of the first part, together with the rights, members and appurtenances to the same belonging, or in any manner appertaining unto the said the Central Railroad & Banking Company of Georgia, and doth hereby transfer, assign and deliver to the said the Central Railroad & Banking Company of Georgia, all the property, assets, rights and credits of every description of the said Macon & Western Railroad Company, to have and to hold the same, and every part thereof, with the appurtenances unto the said party of the second part from the ...... day of ........., eighteen hundred and seventy-one, for and during the entire continuance of the corporate existence of the said the Macon & Western Railroad Company under its present charter or under any amendments or extensions thereof that may hereafter be made.

"And the said the Central Railroad & Banking Company of Georgia hereby covenants and agrees to and with the said the Macon & Western Railroad Company, that during the continuance of the term hereby granted, it will declare and

pay to the stockholders of the said the Macon & Western Railroad Company dividends equal in amount and character, at the same time, and terms as shall be paid to the stockholders of said the Central Railroad & Banking Company of Georgia. But such payments of dividends shall be made on the basis of the present capital stock of the Macon & Western Railroad Company of two millions five hundred thousand ($2,500,000 00) dollars, and the capital stock of the Central Railroad Company of five millions ($5,000,000) dollars, to which sum it is hereby agreed and understood that the same shall be increased before the taking effect of this lease. And that after the capital stock of the Central Railroad & Banking Company of Georgia shall have been raised to five millions ($5,000,000 00) dollars, whenever any stock dividend, or division of assets or accumulations, shall be declared, paid or made to the stockholders of the said the Central Railroad & Banking Company of Georgia, a similar dividend or distribution in amount and quality shall be paid and made to the stockholders of the Macon & Western Railroad, and that all such dividends and distributions of every sort shall be paid to the stockholders of the Macon and Western Railroad Company, as the said Company has heretofore paid its dividends, and be free of all taxes to the stockholders.

" And the said the Central Railroad & Banking Company of Georgia hereby further covenants and agrees to and with the said the Macon & Western Railroad Company, that from and after the taking effect of this lease it will pay the current expenses incident to the working and management of the said Macon & Western Railroad, and all debts and claims against the said the Macon & Western Railroad Company, and all bonds and interest upon bonds of the said Company; which said bonds and interest upon bonds shall be paid on presentation of the said bonds and coupons at the times and places specified therein.

" And the said the Central Railroad & Banking Company

of Georgia hereby further covenants and agrees to pay the salaries of the President and of the Secretary and Treasurer of the said Macon & Western Railroad Company during the continuance of the said lease, reserving to itself the right to fix the amount of the said salaries, with the restriction that the aggregate amount thereof shall not be less than four thousand ($4,000 00) dollars per annum ; and that it will also provide and furnish, at its own expense, all necessary stock, account and transfer books, and all necessary stationery and offices for the said President and Secretary and Treasurer, and pay all proper expenses incident to the meetings of the board of directors of the said the Macon & Western Railroad Company, and permit the president and directors and the secretary and treasurer of the said company to travel on both roads free of charge, in the same manner as the corresponding officers of the said the Central Railroad & Banking Company of Georgia, and that it will provide for the transfer of stock in the said the Macon & Western Railroad Company as that company has heretofore done.

" And the said the Central Railroad Company of Georgia further covenants and agrees to keep in as good order and repairs, as when it shall receive possession and control of the same, the said Macon & Western Railroad and its rolling stock and other appurtenances and to pay all taxes on the property of the said the Macon & Western Railroad Company during the continuance of this lease; and that, in case it shall fail to pay any dividend to the stockholders of the Macon & Western Railroad Company, or any bond, or the interest upon any bond, within six months after the same shall become due and payable, as hereinbefore provided, and be demanded by the person or persons entitled to receive the same, it shall be then lawful for the board of directors of the said the Macon & Western Railroad Company to terminate this lease and to enter upon and resume possession of its said railroad, with the appurtenances and all other its property, hereby demised ; and from thenceforth this inden-

ture and the estate, rights and privileges hereby granted, and every clause and article herein contained shall cease, determine and be void.

" And the said the Central Railroad & Banking Company of Georgia will thereupon deliver immediate and peaceable possession of the said Macon & Western Railroad, its rolling stock and appurtenances, and other property hereby demised, in as good order as it received the same, replacing such as shall have been consumed by use or otherwise disposed of, with other similar property of equal value.

" And the said parties hereby mutually covenant and agree to and with each other that, during the continuance of this lease, neither railroad company will undertake the construction of any new road, or lend credit for that purpose, without the assent of the board of directors of the other company.

" It is mutually understood that nothing herein contained is in anywise to affect the corporate character or existence of the said the Macon & Western Railroad Company during the continuance of the lease ; but that it is to maintain its corporate organization, at all times, during the continuance of its charter, whether as now framed, or as it may be hereafter extended or amended to the fullest extent necessary to preserve its said charter and protect the rights of its stockholders.

" And it is further covenanted, agreed and understood between the parties to these presents that so soon as the necessary legislation for that purpose can be secured, there shall be an amalgamation under the charter of the Central Railroad & Banking Company of Georgia, of the capital stock of the two companies, parties of the first and second part, on the basis of two millions five hundred thousand ($2,500,-000) dollars as the capital stock of the Macon & Western Railroad Company, and five millions ($5,000,000 00) dollars of the capital of the Central Railroad & Banking Company of Georgia, and the said parties hereto, will in good faith, use all legitimate means to procure such legislation.

The Central Railroad Company *vs.* The M. and C. of Macon.

When such amalgamation shall take place by the issue to the (then) stockholders of the Macon & Western Railroad Company, of certificates of stock by the Central Railroad & Banking Company of Georgia, of a like number of *its* shares as the said stockholders may have in the Macon & Western Railroad Company, then the separate organization of the said Macon & Western Railroad Company and every clause and covenant of this lease and agreement shall terminate and cease.

" And both parties hereby covenant and agree, to and with each other, that they will respectively, at any and all times after the date of these presents, and during the continuance of this lease, make, execute and deliver such other conveyances, transfers and instruments in writing and do such other things as shall be considered by counsel learned in the law, necessary to give full effect to this lease, or any part thereof.

In witness whereof the President of the said the Macon & Western Railroad Company, being thereunto authorized by a resolution of the board of directors of said company, adopted on the ...... day of ........., A. D., eighteen hundred and seventy-one, hath hereunto set his hand and the seal of said company, attested by its secretary ; and the President of the said the Central Railroad & Banking Company of Georgia, by virtue of a resolution of the board of directors of said company, adopted on the ...... day of ........., A. D., eighteen hundred and seventy-one, hath hereunto set his hand and the seal of said company, attested by its cashier, interchangeably on the day and year first above written.

"Signed, sealed and delivered in presence of ...... ....."

Pending the reading of said paper, the following was received :

"MACON & BRUNSWICK RAILROAD COMPANY,
"*Treasurer's Office, May* 25th, 1871.

"Copy of a bid from Macon & Brunswick Railroad Company to lease the Macon & Western Railroad and property thereunto belonging.

"To CAPTAIN A. J. WHITE, *President Macon & Western Railroad Company.*

"DEAR SIR: Understanding that the Macon & Western Railroad Company are contemplating a lease of their railroad and other property, I am instructed by George H. Hazlehurst, president of this company, to make the following bid therefor, viz. :

"The Macon & Brunswick Railroad Company will pay for a lease of the Macon & Western Railroad and other property of that company, subject substantially to the terms and conditions of the lease, now existing, of the Southwestern to the Central Railroad Company, twelve per cent. *per annum*, payable semi-annually upon the capital stock of the Macon & Western Railroad Company, viz. : $300,000 00 *per annum* for and during the continuance of the proposed lease.

"Should you desire to effect a lease of your road upon different terms from those embraced in the lease existing between the Central and Southwestern roads, this company asks to be informed of your wishes in that regard, that they may have an opportunity of submitting a bid in conformity therewith.    Very respectfully,
"F. EMMEL,
"*Secretary and Treasurer.*"

This was read but no action was had thereon.    Upon motion, it was resolved that the lease be taken up for action. Mr. Johnston moved, that the proposed lease of the Macon & Western Railroad to the Central Railroad & Banking Company of Georgia, this day submitted by the president

with the two amendments thereto in the following words: "1st. Which expenses and improvements shall bear a just and equitable proportion to such expenses and improvements upon the Central Railroad. 2d. Except that the Central Railroad & Banking Company of Georgia, shall, nevertheless, be liable to the Macon & Western Railroad Company for any damages that said Macon & Western Railroad Company may sustain by reason of terminating this said lease and agreement," as agreed to by the President of the Central Railroad & Banking Company of Georgia, be adopted and accepted, and the president and secretary of the company are hereby authorized and directed to sign and execute the same.

"*Resolved*, That the president call a meeting of the stockholders, after giving thirty (30) days notice, and submit to them the said contract and the above resolution for their ratification or rejection."

Mr. Whittle offered as a substitute—

"*Resolved*, That the president is requested to call a meeting of the stockholders of this company on ...... day of ......, at which time shall be submitted to them the question whether or not this company shall make a lease of this road.

"*Resolved*, That in the meantime the president confer with the President of the Macon & Brunswick Railroad Company, and ascertain what security and guarantee that company can give the Macon & Western Railroad Company, for the faithful performance of their offer to lease this road, this day submitted, and that he report the same to the board." Whittle's substitute was voted down by Ross, Reading, Solomon, Johnston, Maury and Holt, directors. Whittle alone voted for it. No other directors were present, except those just named. Johnston's motion was then put and carried without any dissent, except by Whittle. The board then donated a piece of land to White, president, for a church and cemetery at Milner Station, and adjourned till the next regular meeting on the second Thursday in June, 1871.

The Central Railroad Company *vs.* The M. and C. of Macon.

On the 2d of June, 1871, Dabney, Morgan & Company and others, as stockholders of the Macon & Western Railroad Company, owning in their own right over $700,000 00 of its capital stock, for themselves and such other stockholders as might come and become complainants with them, The Mayor and Council of Macon, for itself and its citizens, and as stockholders of the Macon & Augusta Railroad Company, and of the Macon & Brunswick Railroad Company, presented to Judge Cole a bill to enjoin the consummation of this arrangement and any further action under what had been done.   They had no copy of the proposed contract, but stated what they supposed were its terms, and attacked it as follows :

"Said lease was made by the President of the Macon & Western Railroad Company in collusion and conspiracy with the officers of the said Central Railroad & Banking Company, and in fraud of the rights of complainants ; that it was arranged clandestinely with said officers and consummated in hot haste ; it was entered into without consultation with complainants, who own a large portion of the stock of the Macon & Western Railroad Company, and two of whom are directors therein, and hurriedly assented to by a meeting of the board of direction, which was not legally called or legally constituted, in that several directors were not notified of said meeting, as required by the by-laws of said Macon & Western Railroad Company, either verbally or in writing, and especial care and active measures on the part of the President of the Macon & Western Railroad Company, were taken to keep those directors, who were not notified of said meeting, as hereinbefore stated, ignorant of the call for said meeting and of its object.   At said meeting, after said contract was agreed upon, a resolution was proposed by one of the directors of said Macon & Western Railroad Company, to submit said contract of lease to the stockholders of said company for their ratification or rejection, to which resolution the other directors present at length gave an unwilling consent.   The pres-

ident of said company, in disregard of said resolution, is about to deliver said Macon & Western Railroad, and all of its property, to the said Central Railroad & Banking Company, without awaiting the action of said stockholders under said resolution, and this will be done unless said company is restrained by an immediate order of this Court. Said contract of lease is illegal—

" 1st. Because it was entered into by a portion of the directors of said Macon & Western Railroad Company, at a meeting of which no proper or legal notice was given—the by-laws of said company requiring that a written notice of the hour of the meetings of the board of direction shall be given to each director, and the fact being that no notice of said meeting of any kind was given to at least four of the directors of said company; at which said meeting so clandestinely and illegally called, the President of the Macon & Western Railroad Company produced said contract of lease, an instrument long, elaborate and important, already prepared, and the same was hurriedly adopted, the said president urging its immediate adoption, strenuously opposing any postponement of action or consultation with the stockholders, as well as all amendments proposed in the interest of the stockholders of the Macon & Western Railroad Company.

" 2d. Because at said meeting a proposition to submit the question of the lease of the road and its property to the stockholders before any action should be taken, which was submitted by one of the directors present, was summarily voted down.

" 3d. Because said lease was made without authority of law on the part of either of the parties to the same. It purports to have been made in pursuance of an Act of the Legislature, approved January 22d, 1852, and of the charter of the said Macon & Western Railroad Company: but said Act does not authorize the sale, but simply the lease of connecting roads, and the said agreement, if permitted to be consummated, will amount to an absolute sale of the entire prop-

erty, rights, privilegs, immunities and franchises of the said Macon & Western Railroad Company, and such an absolute sale is not within the purview and spirit of said Act.

"Such construction of said Act directly contravenes and defeats the policy of the State, as exhibited in its legislation for a long series of years in reference to railroads and other corporations. The true intent and meaning of the said Act is to authorize the Central Railroad & Banking Company to lease the road-bed and fixtures of connecting roads, and to run their own locomotives and cars thereon, and this is apparent from the third section of said Act. Said Act was passed at the instance of the said Central Railroad & Banking Company, and they deny the constitutional power of the Legislature to authorize the Central Railroad & Banking Company to lease connecting roads through the action of the directors of such connecting roads without the assent of their stockholders, in such an Act, even with the assent of a majority of their stockholders against the wish of a minority of said stockholders. There is not anything in the charter of the Macon & Western Railroad Company, or in that of the company of 'which it is the successor, to authorize said Macon & Western Railroad Company to enter into said contract.

"4th. Because said contract is such an one as cannot be made by the directors of a railroad corporation without the consent of its stockholders.

"Because it is a contract which cannot be made against the dissent of a single stockholder.

"6th. Because it is a contract which is *ultra vires* and in contravention of public policy, and cannot be entered into even with the assent of every stockholder of each of the contracting roads.

"Said contract is a fraud upon their rights, and if allowed to be consummated according to the obvious intention and design of the parties thereto, will work great and irreparable injury and damage to them. Even if the directors of the

The Cenlral Railroad Company *vs.* The M. and C. of Macon.

Macon & Western Railroad Company have the authority to enter into any contract of lease of said road, still they, stockholders as aforesaid, insist that said contract was a fraud upon them and other stockholders in said company. Had the property embraced in said lease been advertised for sale or lease publicly, or offered for sale or lease privately, under circumstances which would have insured competition in bids, a much larger price would have been obtained. Other railroad corporations competing with the said Central Railroad & Banking Company for freight and travel from Macon to the Atlantic, are deeply interested in the management and control of the said Macon & Western Railroad Company, and they would have become bidders for the purchase or lease of said railroad, if an opportunity had been offered them. They, in fact, say that the Macon & Brunswick Railroad Company, owning a road which is one of the natural connections of the said Macon & Western Railroad, accidently hearing of said meeting and its object, hurriedly prepared and submitted to the said meeting a proposition for the lease of said road, upon terms which were admitted to be more favorable than those then under consideration, offered by the Central Railroad & Banking Company, which was laid aside without being submitted to a vote, a copy of which proposition is stated *ante.* By this private, clandestine and predetermined arrangement between the officers of the Central Railroad & Banking Company and a portion of the directors of the Macon & Western Railroad Company, made without their knowledge or consent, their large interest in the Macon & Western Railroad Company has been sacrificed for a consideration wholly inadequate to its great value at this time with such great and rival competition for its control, and wholly inadequate to its intrinsic value.

"Said contract, if consummated, does not give them even the advantage of a permanent investment or certain income, inasmuch as the said Central Railroad & Banking Company, in it, reserve to themselves the power to terminate it at will,

and inasmuch as the dividends which the said company is to pay, are dependent upon the net earnings of this speculative company, burthened and complicated with leases and indorsements and guarantees almost innumerable.

" The said contract is in fraud of their legal rights, made by their agents without their authority and consent, made in the interest of their agents and not in their interests; made without authority of law, and in perversion and distortion of the plain and obvious import of the statute, and made in the face of an admitted better proposition from the Macon & Brunswick Railroad Company, which offered to lease said Macon & Western Railroad and pay to its stockholders a certain dividend of twelve per cent. *per annum* upon their stock.

" The Mayor and Council of the city of Macon, represent that the said contract of lease, if consummated and executed, will cause irreparable damage and loss to the real estate and to all the interests of the said city, and that it will be unparalleled in injustice, ingratitude and unprovoked wrong to the said city. They show that the said city was an original corporator in the Central Railroad & Banking Company of Georgia, and made a subscription to the stock of said company which resulted in a loss to her of more than half a million dollars, and that but for the active efforts of the said city and of her citizens, the said Central Railroad would probably never have been built, and the said Central Railroad & Banking Company would never have had a legal existence. They further show unto your Honor, that the said city of Macon contributed a large sum of money to the building of the said Macon & Western Railroad, and took stock in said road, then known as the road of the Monroe Railroad & Banking Company, and that said subscription also resulted in the loss of a large sum of money to said city. Said city of Macon subsequently, and in pursuance of her policy, to aid all roads terminating within her limits, permitted the said Central Railroad & Banking Company and

the said Macon & Western Railroad Company, and the Southwestern Railroad Company, by crossing the Ocmulgee river and extending their lines, to connect the same within its limits, with the covenant on the part of said railroad corporations, that they would pay to the city in perpetuity an annuity of five thousand dollars, and would never discriminate against the said city or the citizens thereof, in the regulation of their tariffs of freight in favor of the then *termini* of the said Macon & Western and the said Southwestern Railroads, as will fully appear by reference to a copy of the contract between the said city and the said railroad corporations, entered into on the 24th day of January, 1851, attached.

" The Mayor and Council of said city, insist that the true spirit and intent of said contract and equitable construction to be given to the same, is that the said corporations thus connecting by the liberalty of said city, should never discriminate against her or her citizens, no matter how far their lines should be built or what might be their future *termini;* but such discrimination has already and for a series of years been made, and is now being made, and the intention and object of the said lease between the said Central Railroad &. Banking and the said Macon & Western Railroad Companies is still further to discriminate against Macon and her citizens, to rob her of all the advantages of her position as one of the *termini* of the said Central Railroad and said Macon & Western Railroad, to make her a mere way-station upon this connected line, to divert cotton and other produce from her market, to destroy all competition at Macon in transportation to the sea, and thus most seriously to injure said city and her citizens, in violation of the spirit of said contract of 1851, and in pursuance of a policy of monopoly and consolidation which is opposed to the spirit of all the legislation of the State in reference to corporations. The Mayor and Council distinctly charge that the object of said lease is as they have stated it, and that the result of said arrangement, if it is per-

mitted to be consummated, will cripple the commerce and depreciate the value of all property in said city.

"The Mayor and City Council represent that by said contract with said city of Macon, the said three railroad companies were jointly and severally liable for the payment of said annuity; that said Central Railroad & Banking Company has already absorbed the Southwestern Railroad Company, and if said contract of lease of the Macon & Western Railroad Company is consummated, they will only have the Central Railroad & Banking Company as security for the payment of said annuity, and they charge that in this the security of the city will be greatly jeopardized, by reason of the fact that said Central Railroad & Banking Company is engaged in so many speculative enterprises to build and control other railroads, both within and without the State of Georgia, that its individual security is much less than that afforded by all three roads acting independently.

"Further, said city, in pursuance of its policy to aid railroads terminating within its limits, has burthened itself with debt by subscriptions heretofore made to the Macon & Augusta Railroad and the Macon & Brunswick Railroad, both of which are lines of railway competing with the said Central Railroad & Banking Company in the business of transportation. They further show that its said subscriptions were made in view of the fact that the said Macon & Augusta and Macon & Brunswick Railroads were competing lines with the Central Railroad, and with the assurance that a fair and open competion with said last mentioned road would always be open to them; but they show that such open, fair and legitimate competition is not permitted between said roads, and that the said city and her citizens have lost all the advantages of such competition. The Central Railroad & Banking Company has swallowed the Southwestern Railroad Company and left no trace of it, as a distinct organization, except a few favored officials in the enjoyment of handsome salaries, free tickets and an abundant supply of stationery;

it is now proposing in the same way and with the same incidents, to swallow the Macon & Western Railroad Company; it has secured by these consolidations, and by indorsements and guaranties to other roads, connections with, and control of long lines of railway stretching westward and northwestward, which have made it a huge monopoly and enabled it to shut out the Macon & Augusta Railway, and the Macon & Brunswick Railway from all connection with all railroads west of the city of Macon, and restricted them to a local business. This policy, which is in flagrant violation of the policy of the State, has restricted and curtailed and crippled the business of the said city and rendered its investments in the said Macon & Augusta and Macon & Brunswick Railroads, amounting to hundreds of thousands of dollars, not only unproductive, but almost worthless upon the market. Successive administrations of the government of said city have suffered the aggressions of the said Central Railroad & Banking Company upon its rights, and those of its citizens, for a series of years without an appeal to the Courts, but they ask intervention.

" Said contract of lease was effected by the influence of the Central Railroad & Banking Company in the management of the Macon & Western Railroad Company through the large interest which it owns, without authority of law, in the stock of the said Macon & Western Railroad Company.

They are interested, to the extent of millions of dollars, in the stock and bonds of the Macon & Brunswick and Macon & Augusta Railroad Companies; they made these investments upon the faith that the State of Georgia would not permit any one railroad corporation to monopolize the business of transportation to the serious injury of other competing railroads, and with the knowledge on the part of those of complainants who are owners of the bonds of the Macon and Brunswick Railroad Company, said bonds were indorsed by the State of Georgia to the extent of more than two millions of dollars, and the indorsement of the bonds of said

Company was but a part of a general policy of aid to railroads, recently adopted by the State, and with the conviction that it would never permit other rival railroad corporations to defeat or interfere with said policy, or to lessen its security for such use of its credit, by injuring and crippling the business of the railroads which have received its aid, through any combinations not authorized by the strict letter of the law. And the said lease is not authorized by law; it is beyond the capacity of the contracting parties, and so directly in contravention of and in opposition to the recently adopted policy of the State with reference to aid to railroads, that it cannot be legalized by the consent of each and every stockholder in each of the contracting companies; for if this contract be consummated by delivery, the Macon and Brunswick Railroad will be strangled, and its business and stock, road-bed and appurtenances become comparatively worthless, and thus will be swept away the only security the State has upon its indorsement of more than two millions of bonds for said company."

To this bill were attached interrogatories touching all of said averments and a prayer for answer, etc.

The contract between the city of Macon and said railroads there concentering is substantially as stated in the bill, at any rate no special notice of it is here necessary.

On the same day, (2d June, 1871,) Judge Cole granted a temporary injunction, and ordered the defendants to show cause why the same should not be made perpetual. The bill was filed and served.

On the 13th of June, 1871, complainants amended their bill by striking out some of the stockholders, complainants, and inserting another, and by averring their amount of stock as $600,000 00 instead of $700,000 00; by averring that three instead of four directors of the Macon and Western Railroad Company had no notice of said meeting, and by the following charges based upon information, received since the filing of the bill:

The Central Railroad Company *vs.* The M. and C. of Macon.

"Notwithstanding the reference of the matter of the ratification or rejection of said lease to the stockholders of the Macon and Western Railroad Company, by resolution passed by said board of directors of said Macon and Western Railroad Company, at the same place and time when and where the said lease was accepted as aforesaid, the said parties were so eager to consummate the fraud concocted against stockholders in said company, that, immediately after the signing and sealing of said pretended lease, the President of the said Central Railroad and Banking Company, being near by for the purpose, the said Macon and Western Railroad, with all its appurtenances and properties, was turned over and passed, by its president, to the President of the said Central Railroad and Banking Company, and a receipt therefor was signed by said last named president, and received by the President of the said Macon and Western Railroad Company, which shows yet more plainly the cloven foot—if, indeed, any plainer exhibition of fraudulent intent were needed—and shows their covin and deceit in this, that whilst they pretended to submit their work to the stockholders of said Macon and Western Railroad Company, they were determined, if they could, not only to forestall the action of the stockholders in the premises, but to prevent any aggrieved stockholder from appealing to the Courts for an injunction by this trick of pretended delivery of the road, and passing receipts, said A. J. White, President, and the other officers and agents of said Macon and Western Railroad Company receiving and now being in actual possession of said Macon and Western Railroad, and other property, as they were before said 25th day of May, 1871.

"Said lease is inchoate and incomplete, and not executed or consummated, in any legal sense, until acted upon by the stockholders at the meeting called for the 20th of June, 1871, pursuant to said resolution. Even then the said stockholders, by a majority vote, cannot bind complainants in the premises. And they pray injunction against the ratification

of said lease, except by unanimous vote of all the stockholders.

"The two said resolutions of the said board of directors of the said Macon and Western Railroad Company, were passed simultaneously, the one following the other immediately, and the words in the first resolution, to-wit: 'The president and secretary of the company are hereby authorized and directed to sign and execute the same,' are to be construed in connection with resolution number two, before referred to, and taken together they mean that the president and secretary may sign and execute the lease when ratified by the stockholders, or subject to their ratification at all events.

"The true intent and meaning of the two resolutions adopted together, is that the entire contract was and should remain incomplete until passed upon by the stockholders.

"In the absence of all authority by said resolutions, and in the teeth of their true intent and meaning, the said President of the Macon and Western Railroad Company, conspiring with the Central Railroad and Banking Company, its officers and agents, and acting in their interest and not in the interest of the stockholders of the company of which he was the head, in hot haste, attempted to deliver, and thought that he did deliver the property of the said road into the hands of the president of the huge monopoly in whose interests he was working, and actually went through the extraordinary farce of taking, in solemn mockery, the receipt of the President of the said Central Railroad Company therefor. There was neither an inventory nor an appraisement taken of said Macon and Western Railroad, its rolling-stock or other properties or appurtenances, no account whatever of the condition of said road, of its value, or of the condition or value of any of its appurtenances, but instantly the property of complainants became the property of others. Complainants agents, according to their proper theory, but not in fact, were set aside, others were installed in their places, Mr. A. J. White, the president, dethroned himself, and enthroned

Mr. William M. Wadley, president; the said Wadley owning no stock and having no interest in complainants' road, but intending to use it henceforth in the interest of his own road and the city at its eastern terminus.

" Whilst the resolutions aforesaid were being considered at the meeting of said board of directors, the President of the said Central Railroad and Banking Company had been called into the room, and was present and heard the resolution providing for the call of the stockholders of the Macon and Western Railroad Company, and the submission of said lease to them read and adopted, and thereby took said road and gave his receipt therefor, with full knowledge that the whole matter was open and incomplete until passed upon by said stockholders, and thereby and then and there became a full participant in the fraud practiced by the unauthorized, illegal and fraudulent conduct of said A. J. White, president as aforesaid."

The defendants, by their respective presidents, answered the bill, admitting the contract as copied *ante*, and justifying it as follows, each denying all fraud and combination. The Central Railroad & Banking Company answered :

" All the property, rights and privileges of the Macon and Western Railroad Company, as to the business of transportation, and the receipt of compensation for the same, has passed into the hands and under the control of this defendant; the said Macon and Western Railroad Company possessing its own separate organization for the purpose of protecting the interests and rights of its stockholders, upon a contract that this defendant, receiving and controlling the earnings of the Macon and Western Railroad, would pay to the stockholders of the said last mentioned company dividends similar in quality and amount, and at the same time that this defendant should declare and pay to its own stockholders. But this defendant denies that any mention is made whatever, in said lease, of the payment of the debts and current expenses of other roads alleged to be leased by this defend-

ant, or that the payment of dividends to the stockholders of the Macon and Western Railroad is, in any manner, by the terms of said lease, made to depend on the debts or current expenses of any other companies.

. "This defendant denies that it was arranged clandestinely or consummated in hot haste; the conferences of this defendant were with the president and chief executive officers of the Macon and Western Railroad, and the details had been discussed for many weeks before the execution of the lease; and this defendant had no knowledge, nor did it consider it a duty to inquire as to who were the advisers of the President of the Macon and Western Railroad Company, except that said president informed the president of this defendant, from time to time, that he was in consultation with the directors of his company, and that they, or a large majority of them, were in favor of the execution of the lease; this defendant knows nothing of its own knowledge of the manner in which the meeting of the directors of the Macon and Western Railroad was called, nor of the notices given for that purpose, and had no reason to believe that any of said directors were left in ignorance of the object of the meeting, or that said meeting was not 'legally called and legally constituted.' But so far as the action of the Central Railroad Company is concerned, this entire business was legally and formally conducted, and the most perfect good faith observed throughout; no more secrecy prevailed than was usual and proper in the conduct of delicate and important negotiations. And while the officers of this defendant did not proclaim their wishes and intentions on the corners of the streets for the gratification of the curious and inquisitive, yet the subject of said lease had been matter of serious discussion among the directors and many of the stockholders of this defendant for a number of years past, and the probability of the result which has been reached by this lease has been well known by intelligent business men and communities interested in the two railroad companies concerned. Said lease was not made

The Central Railroad Company *vs.* The M. and C. of Macon.

without authority of law, but was in good faith made under authority of an Act of the General Assembly of Georgia, approved January 22d, 1852, which has been recognized repeatedly, at meetings of stockholders of this defendant, without a dissenting voice, as sufficient authority in the premises for the directors of this defendant, and has also been recognized as a good subsisting Act by the highest Court of the State of Georgia; and by the charter of the Macon and Western Railroad there was full authority given to the said last mentioned company to act in the premises, and to execute the lease complained of in said bill, even before and without the passage of the special Act aforesaid. And the lease which has been executed is within the purview and spirit of the said charter of the Macon and Western Railroad, and of the special Act of 1852.

"Neither the Mayor and Council of the city of Macon, nor the stockholders of the Macon and Augusta Railroad Company, nor of the Macon and Brunswick Railroad Company are proper complainants to said bill, nor have any right to appear as such, and defendant prays the same advantage of said objection as if the same had been by plea pleaded. And as no stockholder of this defendant has made complaint of its action, this defendant respectfully submits that the only complainants in said bill, who have a right to be heard in the premises, are the stockholders of the Macon and Western Railroad Company; and this defendant prays to be excused from answering the charges by the Mayor and Council of the city of Macon of ' unparalleled injustice, ingratitude and unprovoked wrong to said city,' or of making an exhibit of the relative benefit or injury which this defendant has conferred on said city of Macon and the citizens thereof, as irrelevant to the issue before this honorable Court. This defendant further answering, denies that the Central Railroad and Banking Company reserves to itself the right to terminate said lease at will, nor is it possible to put such a construction on the language of said lease; but on the contrary, the only

power to terminate said lease, under the provisions of the same, resides in the Macon and Western Railroad Company, and was made for its protection.

" As to the allusions to the ability to pay dividends of this 'speculative company,' the capital stock of this defendant has commanded at least an average of ten per cent. more than the stock of the Macon and Western Railroad Company, or of any other railroad company in the State of Georgia.

" Said contract was prepared before the meeting of the directors of the Macon and Western Railroad at which it was adopted, by Alexander R. Lawton, Esquire, of Savannah, as follows : After the general features of the intended lease had been repeatedly discussed between the presidents of the two companies, said presidents met just six days before the meeting of the board of directors of the Macon and Western Railroad, the said Alexander R. Lawton being present, when the latter was requested to take down written memoranda, item by item, of the terms and conditions of the intended lease. After each item had been discussed and modified until it was acceptable to both parties, he was then instructed to prepare a lease in due form, to be submitted to the respective boards of directors of the two companies, and if approved by them, to be executed.   It was prepared in conformity to these instructions and memoranda, and exhibited to the board of directors of this defendant, and by them approved two days before the meeting of the board of directors of the Macon and Western Railroad Company.   When submitted to the last named directors, it was amended in several particulars, and then authority was given by them to the president of said company to execute the same.

" This defendant has no knowledge of any efforts or personal influence used by the president of the Macon and Western Railroad Company to secure the approval of certain directors, or to keep other directors in ignorance of the call for said meeting and its object, nor of the visits of said president to Charleston and other cities to secure these objects.

The Central Railroad Company *vs.* The M. and C. of Macon.

" This defendant has no knowledge of any effort made to secure competition in bids for the lease of the Macon and Western Railroad, and is not aware of any public notice given of a contemplated lease, or of the time of meeting of the directors of said company.

" This defendant has no positive knowledge, but is informed and believes that, at said meeting of the directors of the Macan and Western Railroad, a proposition was made to submit the question of a lease to the stockholders of the same.

" This defendant has no distinct knowledge as to any other proposition to lease said railroad than that which was accepted, but has been informed that a paper was placed before the board of directors of the Macon and Western Railroad, but that said proposition was considered so informal and unsatisfactory that no definite action was taken in regard to it.

" This defendant is not informed, and does not know whether complainants were notified of said meeting, except that this defendant was informed in general terms by the President of the Macon and Western Railroad that notice was given to all the directors of said meeting.

" This defendant holds possession and controls the property of the Macon and Western Railroad under the terms of said lease, subject to be delivered and returned to the proper officers of that company, if the stockholders of the same shall fail to ratify the action of the directors in the premises.

"The President of the Central Railroad and Banking Company was in the city of Macon on the 25th of May, 1871, and near to the place of meeting of the Macon and Western Railroad, but he was not there in order that said lease might be signed in precipitate haste. The board of directors of this defendant had taken action on said lease two days before, and had authorized its president to join the proper officers of the Macon and Western Railroad in its execution, so soon as the directors of the latter company should assent to it. The residence of and family home of the president of the defendant is in the city of Macon, and it was agreed that

he should be there on that day, so that the signatures of the officers of the respective companies should be affixed to the paper on the same day, if the execution thereof should be authorized by the directors of the Macon and Western Railroad; and further, it was desired that said president should be accessible to said board of directors in the event that any explanations should be needed, or modifications proposed. Modifications were in fact proposed by said board of directors, and said president was called in by them, and his assent to the same given in behalf of this defendant."

The answer of the Macon and Western Railroad Company was as follows :

" The individuals and firms mentioned and set forth in complainant's bill, are stockholders in the Macon and Western Railroad Company, and for about the stock alleged in said bill. It may, also, be true that said complainants are also stockholders in the Macon and Brunswick Railroad Company, and for a much larger amount of stock, nominally, than the amount of stock owned by them in the Macon and Western Railroad Company, but this defendant submits that, as such stockholders, they have no right to be parties to the bill of complainants, and no right in law or equity to sue this defendant, or to require of this defendant any answer touching the matters alleged, stated and charged in complainants' bill.

" The city of Macon owns no stock nor possesses any property interest in the Macon and Western Railroad Company; and while it may or may not be true that said city may own stock in the Macon and Brunswick Railroad Company, and in the Macon and Augusta Railroad Company, yet neither such ownership of stock, nor any other facts stated in said bill, if true, can give the city of Macon any right to be heard in this proceeding, touching the matters stated, alleged and charged in said bill.

" Georgia owns no stock nor possesses any property interest in, or is in any manner liable as indorser on the bonds or

otherwise, of the Macon and Western Railroad Company; and while it may be true that said State is the indorser for a large amount of the bonds of the Macon and Brunswick Railroad Company, such indorsement on the bonds of another distinct and separate corporation can give the State no right to be heard in this proceeding, touching any matters alleged, stated or charged in said bill. And defendant insists that neither the said city of Macon, nor the State of Georgia shall require any further or other answer from this defendant, nor be retained as parties to said bill.

"Defendant denies that in the manner of making said lease, there was anything in the conduct or purposes of either the president or other directors of this defendant, which was illegally or improperly fraudulent, deceptive or clandestine. This defendant denies that any by-law of the company requires written notice to be served on the directors for a special meeting of the board, but only for regular meetings. The usual notice was given in this case, and precisely as is usual, and perhaps with more than ordinary care and emphasis. Perhaps three of the directors living in the city of New York did not receive notice from the president of the company, but these non-residents have never attended a meeting of the board, and are never expected to attend, and are, in fact, only nominal directors. Largely more than a quorum was actually present—not one objected for want of notice, nor to the time or place or manner of assembling—nor to the right of the board assembled to act, and the vote ordering the lease was unanimous, with one single exception, not voting; that exception was the attorney and counselor of the complainants, and himself (by request) drew the order of the board, requiring the president to execute and deliver the lease on that day. Counting every absent director as opposed to the lease, and yet the action of the board, in manner and matter, was legal, and is satisfactory to and is adopted by this defendant. But that all possible objection on this score might be answered and rebutted, this de-

fendant further answering says, that the stockholders of the company have been duly and legally notified to assemble in convention on the 26th day of this instant, for the express purpose of passing on the wisdom and policy of this lease. Complainants and all others, directors and stockholders, are duly notified to be present, in person or by proxy, at said meeting or convention of stockholders, and this call was made part and parcel of the action of the board of directors making the lease; and this defendant submits that this answers all the statements, charges and allegations in said bill touching the manner of making, executing, and delivering of said lease.

" The Central Railroad and Banking Company of Georgia, had authority to lease the road and equipment of this defendant, by express provisions of the laws of the State of Georgia, as shown by the provisions expressly enacted in the charter of said corporation, and in Acts of the Legislature amendatory of said charter, and by the laws of the State of Georgia enacted expressly to authorize the lease of connecting roads by the said the Central Railroad and Banking Company, all of which laws are here referred to as part of this answer. Which charter and amendments and special Acts of the Legislature, were all duly accepted by said company, and have been for many years acquiesced in and acted upon by said company. And the said Macon and Western Railroad is and has ever been a railroad connecting with the said Central Railroad, and is, indeed, but an extension of the railroad of the said the Central Railroad from the city of Savannah into the interior of the State of Georgia.

" And defendant and the board of directors of this defendant, had authority to lease their road to the said the Central Railroad and Banking Company, by clear provisions of the charter of this company, and by express legislation of the State, and which are here referred to as part of this answer. And said provisions and enactments of the Legislature were the established law for this company at and before the complainants became stockholders therein.

" As the lease is authorized by law, the policy of the State cannot be infringed or in any manner violated thereby, because the policy of the State can only be known by the laws of the State, and cannot be set up in opposition to the express enactments of the State.

" F. Emmel, signing himself Secretary and Treasurer of the Macon and Brunswick Railroad Company, did send a proposition during the sitting of the board on the 25th of May, a copy of which proposition defendant believes is correctly set forth *ante.* This defendant was shown no authority in said Emmel to bind the president and directors of said company, and no authority in said president and directors to bind the said corporation, and no law vesting authority in said corporation to lease the road of defendant, or any other connecting road. But even if such authority existed, this defendant would be unwilling to make a lease to said Macon and Brunswick Railroad Company on any other terms, because said company, by its own official reports, is shown to be of very doubtful solvency, and has not been able to pay its expenses and the interest on its debt, and exhibits no income, whatever, out of which to pay a dividend of twelve per cent., or any other per cent., for the lease of the road and property of this company. Said Macon and Brunswick Railroad Company is already under bonded debts and obligations which, in the opinion of this defendant, it will never be able to discharge; and there is no consideration of law, equity, wisdom or policy, which could induce this defendant to link its fortune with any corporation in the financial condition of said Macon and Brunswick Company.

" Defendant admits that complainants 'own a much larger interest as stockholders and bondholders of said Macon and Brunswick Railroad Company, than they own in the corporation of this defendant.' And this deponent has reason to believe, and does believe, that complainants purchased the stock of this company solely with the intent of enabling them, if possible, to use this defendant's property to sustain and pre-

serve the value of their interest in said Macon and Brunswick Railroad, and without any reference to the interest of this defendant, or of the other stockholders in the road of this company.

"Defendant denies that any damage, whatever, irreparable or otherwise, will be done to complainants as stockholders in the Macon and Western Railroad Company, by said lease. On the contrary, they will, as such stockholders, be greatly benefited by said lease. The market value of the stock of the said the Central Railroad and Banking Company was, at the date of said lease, and for a long time before, had been greater than the market value of the stock of this defendant, and the income of said the Central Railroad and Banking Company very largely exceeds its expenditures, and renders it amply able to pay remunerative dividends, and to preserve and increase the value of the property of this defendant during the entire term of said lease.

"This defendant knows of no other corporation connecting with the road of this defendant having either the authority in law to make said lease, or the financial ability to discharge its obligations as lessee; and, therefore, this defendant admits that no other corporation was applied to make said lease, and no competing bid was sought or expected.

"If any injury results to complainants from said lease, it can result to them only as stockholders and bondholders of the Macon and Brunswick Railroad Company, and it will result to them in that character chiefly, if not entirely, by defeating their long cherished scheme of controlling and using, by lease, purchase, or otherwise, the road and property of this defendant, to give a strength and value to their stock in the Macon and Brunswick Railroad Company; and defendants believe and charge, that complainants have exhibited their bill, and seek to embarrass and enjoin the lease actually and legally, solely in their interest, as stockholders and bondholders in the Macon and Brunswick Railroad Company. The well known acts and purposes of complain-

ants, looking to the final control of the Macon and Western Railroad in the interest of the Macon and Brunswick Railroad, solely with the intent of advancing the interests of complainants in the latter road, and with the result of certain and material damage to all the remaining stockholders of the Macon and Western Railroad Company, did have the effect of depreciating the stock of this company in the market, at least ten per cent.; and to avoid further depreciation, and protect themselves from constant apprehension on this subject, formed one of the important reasons influencing the remaining stockholders to seek and desire the connection established by the lease with the said the Central Railroad and Banking Company. It was the natural preference for a safe and altogether responsible corporation over one that was deemed unsafe and irresponsible.

" The president of this company did confer freely and frankly with the stockholders of the company touching the proposed lease, before it was consummated. He did visit Charleston and other places, for he desired to act in accordance with the will of the stockholders on this subject. He did find them anxious and urgent for the lease. He did not, probably, confer with complainants, for the reason that they were known to be controlled by their predominant interest in another corporation, and did not favor a lease because of its supposed effect upon those other interests."

On the 20th of June, when this cause came on for hearing, Judge Cole was absent by reason of sickness, and Judge Alexander, of the Southern Circuit, presided. Before the hearing, the Governor, by counsel, prayed to have the State made a party complainant, upon the following grounds:

1st. The proposed lease is unauthorized by any law of said State, or by the charter of the said Central Railroad and Banking Company.

2d. It tends to the creation of a monopoly and will, if consummated, contravene the public policy which induced said State to authorize the construction of rival and compet-

ing lines of railway to the said Central Railroad, and to aid in the construction thereof said rival lines of railway, the construction of which was so authorized and aided being the railroad from Macon to Brunswick in said State, known as the Macon and Brunswick Railroad, to which the aid of the State in the construction thereof was largely extended, as will hereinafter more fully appear, and the railroad from Macon to Camak, known as the Macon and Augusta Railroad, built by virtue of a charter granted by said State.

3d. Said lease, if consummated, will not only greatly injure the said Macon and Augusta Railroad, and defeat the object the State had in view in authorizing the construction thereof, but it will render valueless the said Macon and Brunswick Railroad, whose bonds to the amount of more than two and a half millions of dollars, have been indorsed by said State, and are now held by persons who have purchased the same *bona fide* and for value, and to whom said State is liable for the payment thereof; and will render the said Macon and Brunswick Railroad Company, by diverting freights and travel and business therefrom, wholly unable to pay said bonds, or the interest accruing thereon, and thus involve said State in the loss of the amount aforesaid with the accruing interest thereon.

4th. The State is a stockholder in the Atlantic and Gulf Railroad Company, also a rival line of the road of the Central Railroad and Banking Company, and of which the Macon and Brunswick Railroad is a connecting road and a feeder; said lease, if consummated, will, as already alleged, divert freight and travel from the said Macon and Brunswick Railroad, and so impair its business as to render it valueless, a large amount of freight and travel which now passes over the said Macon and Western Railroad, and said Macon and Brunswick Railroad, and thence along and over the said Atlantic and Gulf Railroad, will be wholly diverted therefrom, and entirely lost to the last named road, to the great injury of said State as a stockholder therein.

The Central Railroad Company *vs.* The M. and C. of Macon.

5th. Said lease, if consummated, will be a fatal blow to the whole policy of said State in granting aid in the construction of railways within her bounds. The roads to which said aid has been extended by the endorsements of the bonds thereof, and the amounts for which the State is pledged by law to extend aid upon the fulfilment of certain conditions by said roads is set forth in the following exhibit:

| NAME OF RAILROAD. | AM'T OF STATE AID PER MILE. |
|---|---|
| Alabama and Chattanooga | $ 8,000 00 |
| Albany and Columbus | 12,000 00 |
| Albany, Mobile and New Orleans | 12,000 00 |
| Americus and Florence | 12,000 00 |
| Americus and Hawkinsville | 12,000 00 |
| Americus and Isabella | 12,000 00 |
| Athens and Clayton | 15,000 00 |
| Atlanta and Blue Ridge | 15,000 00 |
| Atlanta and Lookout..........(per 8 miles).. | 15,000 00 |
| Augusta and Hartwell | 15,000 00 |
| Brunswick and Albany, $15,000 and $8,000 additional | 23,000 00 |
| Camilla and Cuthbert | 12,000 00 |
| Cartersville and Van Wert | 12,500 00 |
| Chattahoochee | 12,000 00 |
| Columbus and Atlanta Air-Line | 12,000 00 |
| Dalton and Morganton | 15,000 00 |
| Fort Valley and Hawkinsville | 12,000 00 |
| Georgia Air-Line | 12,000 00 |
| Georgia Seaboard and North-Western | 12,000 00 |
| Grand Trunk | 12,000 00 |
| Great Southern | 12,000 00 |
| Griffin, Monticello and Madison | 15,000 00 |
| Lookout Mountain | 15,000 00 |
| Macon and Augusta | 10,000 00 |
| Macon and Brunswick, $10,000 and $3,000 additional | 13,000 00 |

| | |
|---|---:|
| Marietta, Clayton and Ellijay....... .......... | 15,000 00 |
| McDonough Western........................... | 12,000 00 |
| Memphis Branch................................. | 15,000 00 |
| Newnan and Americus.......................... | 12,000 00 |
| North and South.............................. ...... | 12,000 00 |
| North Griffin and North Carolina............. | 12,000 00 |
| Ocmulgee and North Georgia................∴.. | 15,000 00 |
| Polk Slate Quarry.............................. | 15,000 00 |
| Savannah, Griffin and North Alabama........ | 12,000 00 |
| South Georgia and Florida..................... | 15,000 00 |
| St. Mary's and Western........................ | 15,000 00 |

The motive which lies at the bottom of said attempted lease, is, by the consolidation of capital and power and ruinous discriminations against the roads thus fostered and aided by the State, to break down said roads and thwart and destroy the policy of said State, in aiding in the construction thereof.

6th. Said Macon and Western Railroad is not a connecting Railroad with the said Central Railroad in the sense of the Act of the Legislature approved January 22d, 1852, by virtue of which said Central Railroad and Banking Company claims the authority to lease said Macon and Western Railroad. Said last named road is connected with and a feeder of two rival and competing railroads to the said Central Railroad, to-wit: the said Macon and Augusta Railroad, and the said Macon and Brunswick Railroad. It not only connects with said two last named roads as well as said Central Railroad, but is a main trunk connecting the interior of said State with the upper or northern portion thereof, and thence with the great West, from which all three of the railroads aforesaid derive a large portion of their freight and travel, and on which they are chiefly dependent for their business.

This was allowed over defendant's objection thereto. Also two persons, stockholders of the Central Railroad and Bank-

ing Company, prior to the 25th of May 1871, were made complainants because they averred that they together owned two hundred and fifty shares of its stock, and contended that the lease could not be made without their consent; that the stockholders had not consented thereto, and because they feared that public prejudice might be so excited against the Central Railroad and Banking Company by this lease as to lessen the value of their stock, and that by doing this illegal act the State might forfeit its charter.

Judge Alexander, after argument, retained the injunction, solely upon the ground that, by reason of the decision of this Court in *Collins vs. The Central Railroad Company, et al.,* 40th Georgia Reports, 582, it was doubtful whether it had power to lease the Macon and Western Railroad Company. Each party excepted, and brought the cause here for review. The defendants say he erred in allowing the State to become a party, and in holding that the Central Railroad and Banking Company had not the legal capacity to lease said railroad. The complainants say he erred in the following decisions made in said cause:

1st. That the proposed lease does not interfere with the object of the Legislature in creating the corporation now known as the Macon and Western Railroad Company.

2d. That the Macon and Western Railroad Company have the power, under their charter and the amendments thereto, to make a lease of their road and its equipments and appurtenances.

3d. That the contract between the Macon and Western Railroad Company and the Central Railroad and Banking Company of Georgia, exhibited to complainants' bill, is a lease.

4th. That the contract between said railroad companies, exhibited to said bill, if a lease at all, is such a lease as the Macon and Western Railroad Company have the power to make under their charter and the amendments thereto.

5th. That the stockholders of the Macon and Western

The Central Railroad Company *vs.* The M. and C. of Macon.

Railroad Company, in convention assembled, might determine whether or not they would rent and farm out their exclusive right of transportation, and give their officers such direction and powers as might be necessary in the event a proper lessee could be found, or such powers as might be necessary to complete this lease in the event the injunction granted should hereafter be dissolved.

When the causes were argued here, by consent they were consolidated. The Court allowed nine hours for the argument and six speeches to be made.

JACKSON, LAWTON & BASSENGER; LYON, DEGRAFFEN-REID & IRVIN; B. H. HILL, for the defendants in original bill.

WHITTLE & GUSTIN; A. O. BACON; NISBETS & JACKSON; LANIER & ANDERSON; W. R. PHILLIPS; B. B. HINTON, for the complainants in the bill. Corporate powers never conferred by implication: 1st Kelly, (Georgia Reports,) 533; 7th, 221, 224; 8th, 24; 23d, 457; 25th, 457; 40th, 582; 2d Cranch, 716; 13th Peters, 587; 3d Wend., 482; 1st Black., 380; 13th Penn., 133. Ambiguities operate against corporation: 11th Peters, 543; 9th Georgia Reports, 221; 40th, 582. Act of 1852 construed by this Court: 40th Georgia Reports, 582. A lease is for a definite term of years with reversion to grantor: Code, sec. 2252, and for a certain sum. This is no lease but partnership: Storey on P., sec. 67; 8th Georgia, 285; 33d, 243. Any stockholder can object to partnership or amalgamation, because *ultra vires*: 21st Howard, (U. S.) 441; 16th L. and E. R., 180; 10th Barb., 1; 9th Howard, (U. S.) 172; 20th Vt. R., 93; 40th Georgia, 582, and cases cited. The State is proper party, because charter is contract with State: Code, sec. 22; 40th Georgia, 641; 4th Wheat., 518; 6th Cranch, 88; 7th, 164; 9th, 43, 292; Adams Eq., s. p., 313; 7th Paige, 305; 1st Barbour's Ch. R., 157, 164; 29th Conn. R., 538. *Mandamus vs.* corporation violating charter: 2d B. and A., 646;

2d Eng. R. and C. cases, 437, 508, 520, 646; 4th, 81; 23d Wend., 548. Both railroads must have authority to make lease: 40th Georgia Reports, 636–7; 21st Howard, 442. If stockholders object lease cannot be made: 2d Red. on Railways, 575; P. on Am. R. R. L., 78, 83; 1st Red. on Railway, 73. The Act of 1852 is not adopted by Act of 1868, and is, therefore, not of force. The M. and W. R. R. Co. can only lease its transportation. The paper is not a lease: Sheppards' Touchstone, 226; Code, sec. 2252. Rather an assignment by which a partnership is formed: Code, secs. 1877, 1880. The power to lease is not in directors, but in company: 1st Red., 77. Act of 1852 obsolete because not accepted: 13th S. and R., 452. State is opposed to monopoly: 39th Georgia Reports, 166; 40th, 582; 29th, Conn., 538. This is absolute sale: Code, sec. 2252; Bacon's Abridg., 433. They cannot be partners: 7th Wend., 412. Nor amalgamate: 1st Stockt., 401; 6th Ohio N. S., 119; 2d Red., 575–6–7, note 5.

WARNER, Judge.

1. This is a bill filed in behalf of a portion of the stockholders of the Macon and Western Railroad Company, and in behalf of the Mayor and Council of the city of Macon, who sue in behalf of said city and of the citizens thereof, and as stockholders of the Macon and Augusta Railroad Company, and of the Macon and Brunswick Railroad Company, against the Macon and Western Railroad Company, and the Central Railroad and Banking Company, praying for an injunction to restrain the consummation and execution of a contract for the lease of the Macon and Western Railroad to the Central Railroad and Banking Company. On motion, the State was made a party complainant to the bill. A rule to show cause why the injunction should not be granted, was served on the defendants, who appeared and filed their answers to the allegations in complainants' bill, and objected to the

State being made a party, and that the city of Macon was not a proper party complainant; which objections were overruled. On hearing the motion for an injunction, the same was granted by the presiding Judge, to which the defendants excepted. The State was not a stockholder in either the Macon and Western or Central Railroad Companies, and, therefore, had no *direct interest* in the decree to be rendered, as between the contestants. If the State had any interest in the controversy, it was in her sovereign capacity as the representative of the whole people of the State, and should have appeared before the Court in her sovereign capacity, by the appropriate mode of procedure in such cases. The consummation or non-consummation of the private contract of lease between these two corporations, was not a claim inconsistent with the sovereignty, jurisdiction or rights of the people of the State. It was a mere *private suit* between these two corporations, to which the State, in her sovereign capacity, was not a proper party. The city of Macon suing in behalf of the citizens thereof, or other artificial persons, had no *direct interest* in the decree to be rendered, as to the legal right of these two corporations to make the contract in question, which would entitle it to be made a party complainant. The question as to the legal right of the two companies to make and accept a lease of the road, is a question which involves the legal rights of the complaining stockholders in the respective companies, and the legal rights of those companies under their respective charters. The decree as to the legal right of the two corporations to make the contract, would only bind *them* as to their legal right to make it, and that is the sole question presented by the complainant's bill, with which the State or the city of Macon have no concern, so far as the *legal right* of the two corporations to make the contract of lease, is involved.

The main question in the case, as made by the pleadings in the record, is as to the legal right of the Macon and Western Railroad Company to *lease* that road to the Central

The Central Railroad Company *vs.* The M. and C. of Macon.

Railroad and Banking Company, in the manner therein set forth. By the 11th section of the charter of the Monroe Railroad Company it is declared, " that said Monroe Railroad Company shall have the *exclusive right* of transportation and conveyance of persons, produce, merchandise and all other things over the railroad to be by them constructed, as long as they shall see fit to exercise such exclusive right." And it is further provided in the same section of the charter, "that said company may, when they see fit, *rent* or *farm out* any part or the whole of their said exclusive right of transportation on said railroad, *with the privileges thereof*, to any individual or individuals, or *other company*, subject to the rates above mentioned." By an Act of the General Assembly of 1847, the Macon and Western Railroad was incorporated, and all the powers and *privileges* conferred on the Monroe Railroad Company were conferred on the Macon and Western Railroad Company, with certain exceptions, which are not pertinent to the question now before the Court. The grant to the Monroe Railroad Company was certain enumerated privileges, with the exclusive right of transportation over the road to be constructed by them, as long as they should see fit to exercise such exclusive right ; but if the company should see fit to rent or farm out any part or the whole of their exclusive right of transportation on·said railroad, they were authorized to do so, *with the privileges thereof*, that is to say, *with the privileges of the railroad* which had been granted to the company, as well as the exclusive right of transportation thereon. The privileges conferred on the company by the charter, was to enable them to construct the railroad for the transportion of persons, produce and merchandise, as long as they might see fit to do so ; but whenever they should see fit to rent or farm out their exclusive right of transportation on the road to another company, then it became absolutely necessary that the *privileges of the railroad* granted to the company should be also rented and farmed out, so as to enable the lessee to enjoy the benefit of

the exclusive right of transportation on the road. The charter not only confers the power on the company to lease the exclusive right of transportation on the railroad, but also the *privileges of the road* granted to the company by the charter, so as to enable the lessee to have, enjoy and control the exclusive right of transportation on the road, in as full and ample manner as the original grantees could have done under the charter. The grant in the charter to rent or farm out *the privileges of the road,* was indispensable to secure the exclusive right of transportation on the road, to the lessee thereof, unless the right could be maintained on the principle, that when the law doth give anything to one, it giveth impliedly whatsoever is necessary for enjoying the same. The authority, however, is expressly granted in this charter to the company, not only to rent and farm out the exclusive right of transportation on the road, but *the privileges thereof,* so as to enable the lessee of the road to enjoy such exclusive right of transportation. The power to lease *the privileges of the road,* as conferred by the charter, was necessary to the enjoyment of the exclusive right of transportation, in the opinion of the Legislature, as manifested by the grant conferring that power. The Macon and Western road had the legal power and authority, under its charter, to make the lease.

Did the Central Railroad, under its charter and the Acts of the General Assembly amendatory thereof, have the legal power and authority to purchase and accept the lease under the contract made between that company and the Macon and Western road? In 1850 the General Assembly passed an act to *unite* the Central Railroad and Banking Company and the Macon and Western Railroad Company, and other railroad companies, reciting in the preamble of that Act, as a reason for its enactment, "that large sums of money had been expended by incorporated companies (one of which was the Central road) and from the State Treasury, for the purpose of opening and constructing railroads from the seaboard

to the Western limits of the State, and in order that the citizens of the State should derive the full benefit intended by the line of railroads so constructed, it is expedient that the transportation of freight and passengers over said line should be as free from interruption and transhipment as possible." The Act then declares that it shall be *lawful* for the Central Railroad and the Macon and Western Railroad and the Southwestern Railroad Companies to *unite* their respective railroads in one common depot at or near the city of Macon, so that the cars of the respective roads may *pass from one road to another uninterruptedly.* It appears from the record that the Macon and Western railroad is *united* and *connected* with the Central Railroad, and is indeed but an extension of the latter road from the city of Savannah to the interior of the State. In 1852 the General Assembly passed an Act amendatory of the charter of the Central Railroad Company, enlarging the powers of that company, the object of which was, as shown by the caption of the Act, to authorize the company to lease and work such other railroads as *then* connected with it, or might *thereafter* connect with it for a term of years, or during the continuance of their respective charters. The first section of that Act declares, " that it shall and may be *lawful* for the Central Railroad and Banking Company of Georgia to lease and work, for such time, and on such terms as may agreed on by the parties interested, the Augusta and Waynesboro Railroad, the Milledgeville and Gordon Railroad, the Eatonton Branch Railroad, the Southwestern Railroad, and such other railroads as *now connect* or may *hereafter connect* with the Central Railroad, and to collect, by suit or otherwise, the fares of travel and the charges of transportation on railroads so leased. The second section of the Act declares, " that the respective boards of directors of the incorporated companies owning the railroads above mentioned, or owning such other railroads as *now connect*, or may *hereafter connect* with the Central Railroad shall have power and authority so to lease to the Central Railroad

and Banking Company of Georgia, their respective railroads for such time, and on such other terms as they respectively may deem best." By this Act the Central Railroad Company has the power expressly conferred upon it, by this amendatory provision of their charter, to *lease* not only the railroads specified by name, but such as *then* connected with it or *thereafter* might connect with it; and the Act further confers the power and authority on the respective boards of directors of other incorporated railroad companies owning such other railroads, (than those specified by name) as *then* connected or might *thereafter* connect with the Central Railroad, to lease to the last named railroad company their respective railroads, for such term of time, and on such terms as they respectively may deem best. Whether this power, so clearly and expressly conferred on the Central Railroad Company, was *wisely* or *unwisely* conferred by the General Assembly, is not a question for the Courts to determine. The question for the Courts to decide is whether the power has been granted, and if it has, to protect the company in the enjoyment of their rights acquired under that grant of power conferred by the General Assembly. What is a *connecting* road, in the sense in which that term is used, in the Act of 1852? The best definition of a *connecting* railroad, as applicable to this case, is that given by the General Assembly in the Act of 1850, providing for the *uniting* the respective railroads therein named: "so that the cars of the respective roads may pass from one road to another uninterruptedly, without the transhipment of freight or passengers." That was the kind of *connecting roads* the Legislature had in contemplation in the passage of the Act of 1852. What is the character and effect of the instrument set forth in the record as the evidence of the contract between the two companies, when construed and interpreted in accordance with the acknowledged principles of the law applicable to such an instrument? It purports on its face to be *a lease* of the Macon and Western Railroad to the Central Railroad, and

recites the provision of the charter of the Macon and Western Railroad Company, which authorizes that company to rent or farm out its exclusive right of transportation on said railroad with the privileges thereof, to any individual or individuals, or other company. It also recites the provisions of the Act of 1852, which authorizes the Central Railroad to *lease connecting roads.* And it is quite clear on the face of the instrument that it was *the intention* of the parties to make a contract for *a lease* of the road, and not a contract for *the sale* and absolute conveyance of the title to the road. In the construction of a deed, if there be two clauses utterly inconsistent, the *former* must prevail, but the *intention* of the parties from the whole instrument, should, if possible, be ascertained and carried into effect: Code, 2655. The cardinal rule for the construction of contracts is to ascertain *the intention* of the parties. If that intention be clear, and it contravenes no rule of law, and sufficient words be used to arrive at *the intention,* it shall be enforced, irrespective of all technical or arbitrary rules of construction. The intention of the parties may differ among themselves. In such case the meaning placed on the contract by one party, and *known* to be thus understood by the other party, at the time, shall be held as the true meaning: Code, 2713, 2714. In this case both parties intended to make a contract for *a lease* of the road, and both parties understand it now to be *a lease* of the road, and there is nothing in the instrument itself which requires that the Court should understand it differently. The words employed are not such as would indicate an intention to make *a sale* of the road, and convey an absolute title thereto to the purchaser thereof; but, on the contrary, the Macon and Western Road expressly reserves the right to enter upon and resume the possession of the road and its appurtenances, on the failure of the Central road to comply with the terms and stipulations of the contract between the parties. Construing the contract in accordance with the *expressed intention* of the parties on the face thereof, as well as

the legal effect of the words employed therein, it is a contract for *a lease* of the road to the Central Railroad and Banking Company, and not *a sale* of the Macon and Western road to that company.

In view of the facts contained in this record, the two complaining stockholders in the Central Railroad Company must be presumed to have accepted the provisions of the Act of 1852, authorizing that company to *lease connecting railroads;* the more especially as that company has exercised the power granted by *that Act,* and leased other railroads, without any objection on their part, as stockholders, to the exercise of such power on the part of the company. It is now too late for them to say that, as stockholders in the company, they never accepted and assented to the power granted to the company in the Act of 1852, to *lease connecting railroads.* This is an *absolute* contract for the lease of the Macon and Western Railroad, and contains *independent* covenants. If the legislation mentioned in the covenant for the *amalgamation* of the two roads, so soon as the necessary legislation for that purpose can be secured, should be held, when that legislation is had, to be in violation of the legal rights of the stockholders in either company, under their contract as such stockholders, still, the *absolute* contract for the lease of the road would be a good and valid contract, this latter covenant in relation to the amalgamation of the two roads, being an *independent* covenant, could not defeat the *absolute* contract for the lease of the road, that contract not being *dependent* on the performance of the last named covenant for the amalgamation of the two roads in the manner therein expressed. But the contemplated legislation mentioned in that *independent* covenant, is not now before the Court, and we express no opinion in regard to it. When the contemplated legislation shall be obtained, and the stockholders of either of the companies shall complain of it as illegally interfering with their contract as such stockholders, under the charters of their respective companies, then it will be time

The Central Railroad Company *vs.* The M. and C. of Macon.

enough to consider that question. The State of Georgia and the city of Macon, on the statement of facts disclosed by the record, were not proper parties to the complainant's bill of complaint.

The Macon and Western Railroad Company had the legal power and authority, under the provisions of its charter, to lease that road to the Central Railroad and Banking Company of Georgia, and the latter company had the legal power and authority, under the provisions of the Act of 1852, to accept said lease as specified in the contract set forth in the record. In our judgment, the Court below erred in granting the injunction prayed for in complainants' bill.

Judgment reversed.

LOCHRANE, Chief Justice, concurring.

The questions involved in this case have been ably argued by counsel upon both sides, and we have carefully examined the authorities presented, and weighed their application to and effect on the important legal principles involved in the controversy. After a careful consideration of the whole case, I concur in the judgment of the Court just pronounced, for the following reasons, which I shall confine to the main questions in issue:

Did the Central Railroad have the right to lease the Macon and Western Railroad, and did the Macon and Western Railroad have the legal right to enter into such contract of lease, and is the instrument into which they entered such a conveyance as is authorized by law? These questions, with such as grow out of them, and will be discussed in proper place, constitute the controlling merits of the case at bar. In 1850, the Legislature of the State of Georgia, in the exercise of its sovereign authority, passed "an Act to authorize the Central Railroad and Banking Company of Georgia, the Macon and Western Railroad Company and the Southwestern Railroad Company, to unite their respective rail-

roads in one common depot, at or near the city of Macon."
The public policy of the State is declared by the preamble
in the following language : " Whereas, there has been ex-
pended in the State by incorporated companies, and from the
State treasury very large sums of money for the purpose of
opening and constructing railroads from the seaboard to the
western limits of the State; and, whereas, in order that the
State and the citizens thereof should derive the full benefit
intended by the line of railroad so constructed, it is expe-
dient that the transportation of freight and passengers over
said line should be as free from interruption and tranship-
ment as possible."

In 1852, the Legislature passed an Act to authorize the
Central Railroad and Banking Company of Georgia, to lease
and work such railroads as now connect or may hereafter
connect with the Central Railroad, and to authorize the board
of directors of such railroad companies as now have or may
hereafter have their respective railroads connecting with the
Central Railroad, to make leases thereof for a term of years,
or during the continuance of their respective charters.   The
law provides that it shall and may be lawful for the Central
Railroad and Banking Company of Georgia, to lease and
work for such time and on such terms, as may be agreed on
by the parties interested, the Augusta and Waynesboro'
Railroad, the Milledgeville and Gordon Railroad, the Eaton-
ton Branch Railroad, the Southwestern Railroad, and such
other railroads as now connect or may hereafter connect with
the Central Railroad, and to collect, by suit or otherwise, the
fares of travel and the charges of transportation on railroads
so leased.   And, also, that the respective boards of directors
of the incorporated companies owning the railroads above
mentioned, or owning such other railroads as now connect or
may hereafter connect with the Central Railroad, shall have
power and authority so to lease to the Central Railroad and
Banking Company of Georgia, their respective railroads, for

The Central Railroad Company *vs.* The M. and C. of Macon.

such term of time, and on such other terms, as they, respectively, may deem best.

These Acts, taken together, establish, beyond all judicial controversy, two important propositions: first, that the Macon and Western Railroad is a connecting road; the Legislature has so declared; second, that the Central Railroad has the right to lease connecting roads, for such is the express power granted to it by the Legislature. And the Act of 1852 is equally emphatic that the directors of the incorporated companies owning such connecting roads, are clothed with power to lease them to the Central Railroad, in the terms of the Act. We need not, therefore, in the decision of this question, follow the very able argument of our brother Bacon, in relation to the powers conferred by legislation upon the corporations, or discuss the public policy of the State of Georgia, in its auxiliary importance, in arriving at the correct construction of legislative intent; for the statutes are clear, plain and unequivocal, and leave nothing to supply by intendment or construction. This Court has nothing to do with the policy or impolicy of legislative enactments. The Constitution wisely delegates that power to the General Assembly, and they alone are charged with its execution, with a view to the advancement of the public interest, and enhancement of the public welfare. And where the statutory law is plain, neither strictness nor liberality of construction can judicially limit or enlarge the legislative will. We have, therefore, arrived at the conclusion that the Central Railroad has the legislative right to enter into the lease of the Macon and Western Railroad, under the provisions of the Acts recited; and we hold further, that the exercise of the privileges of the Act of 1852, in the leasing of other roads, which has been continuous since its passage, disposes of the complaint of Mr. Gresham, *et al.*, whose acceptance, by acquiescence, estops such dissenting complainants, as stockholders, from now being heard. Corporations once organized under the laws of the land, and represented by di-

rectors, in the management of their chartered organizations a minority of their stockholders are bound by their acts, when done within the walls of their charter, or within the general provisions of law.

The next question, and most important in the adjudication of this case is, whether the Macon and Western Railroad had the power to lease its road. The 11th section of the original Act of 1853, says: "The said Monroe Railroad Company (now Macon and Western Railroad) shall have the exclusive right of transportation and conveyance of persons, produce, merchandise, and all other things over the railroad to be by them constructed, so long as they shall see fit to exercise such exclusive right: *Provided,* the charges for transportation or conveyance shall not exceed, etc.; *and provided, also,* that said company may, when they see fit, *rent or farm out any part or the whole* of their said exclusive right of transportation on said railroad, with the privileges thereof, to any individual or individuals *or other company,* subject to rates above mentioned."

Under this provision the Macon and Western Railroad has the right to lease their right of transportation *with the privileges thereof,* to any individual or *other company.* It will not be denied that the Central Railroad Company comes expressly within the term "*other company;*" and we can realize no possible or positive difference between the power to lease the exclusive right of transportation on said railroad and the railroad itself. The one is essential to the use of the other, and if there were left any imaginable doubt between the one and the other, we might invoke legislative construction of the Act of 1852. But the language of the charter, in connection with the right of transportation on said road with the privileges thereof, carries with overwhelming conviction the right to lease the road, for transportation over the road, which is conceded must bear with it the privilege of the road itself. It would be too strict a construction to say the transportation of the road and the privileges thereof

The Central Railroad Company *vs.* The M. and C. of Macon.

meant only to convey the right of going over the road.   As well might we hold that the lease to a plantation did not include the right to plow the land or give a right to the land or all the privileges thereof, during the term of the lease. We, therefore, hold two propositions settled.   The first, the right of the Central Railroad Company to lease the Macon and Western Railroad, and the right of the Macon and Western to lease itself to the Central.

The next proposition which we deem it necessary to notice, is based upon the ground that the instrument entered into by the contracting parties, it is argued, is not a lease. We have examined this instrument, and are satisfied, under the Code of Georgia, that it was the intention of the parties to execute a lease, and the cardinal rule of construction of all contracts is to ascertain the intention of the parties.   If that intention be clear, and it contravenes no rule of law, and sufficient words be used to arrive at the intention, it should be enforced, irrespective of all technical or arbitrary rules of construction.   And to our minds it was the intention of the parties to execute a lease, and nothing in the instrument can be construed legitimately to impute a different construction. The covenant entered into between the parties to the effect " that so soon as the necessary legislation for that purpose be secured there shall be an amalgamation of these roads," even if it were true that such contract was in itself illegal, which we do not think, by the laws of Georgia would not in the slightest degree invalidate the lease.   For, under the law, contracts are severable, and that which is valid will be maintained by the Courts.   But for myself, I do not think that provision agreed to by the contracting parties subject to the will of the Legislature to enforce by appropriate legislation is invalid.   The legal objection is that this provision may have formed one of the chief inducements to the consummation of the lease, and inasmuch as such act of amalgamation would be illegal without the unanimous consent of all the stockholders, the consideration provides for an illegal

thing, to-wit: bind the stockholders not consenting thereto by a legislative act.   We do not agree with either the premises or the consequences.   In the first place, the lease is a good lease irrespective of the provision, and severable therefrom.   In the second place, this Court will not anticipate the action of the Legislature, but presume always that that body will act in conformity to law.   And in the third place, after legislative provision has been granted to a corporation to do a particular thing, within the scope and enlargement of its powers, I do not hold such act depends upon the unanimous consent of each and every stockholder to give it operation and effect.   On the contrary, I hold that the individual contract of the stockholder, from the date of the legal organization of the company, becomes merged in the company, and all contracts afterwards made are contracts of the corporation, and subject to the direction or ratification of a majority of the stockholders.   And while it may be the right of an individual stockholder to invoke equitable interposition against the company for an act about to be executed in violation of law, still I hold that as to all acts permitted by the Legislature after such permission, a majority of the stockholders represent the company, and their will, when legally ascertained and expressed, bind the minority.   And in the case at bar, if such provision of the lease is ratified by a majority of the stockholders, individual dissent by any portion of a minority would be unavailing to prevent it.   And upon the same principle I dispose of the complaint of the two dissenting stockholders as to the action of the Central Railroad and Banking Company.

McCay, Judge, dissenting.

I agree, that, under the Act of 1853, and under the charter of the Macon and Western Railroad, it is competent for the Central Railroad Company to lease the Macon and Western Railroad, and that it is also competent for the Macon and Western Railroad to be leased.   And were this contract

only a lease, I should agree to the judgment of the Court. But, as I understand this agreement, it is for more than a lease. It is a contract, that if the Legislature consents, the Macon and Western Railroad Company shall lose its separate existence, and be merged into the Central Railroad Company. Now, as I understand the law, this is a contract that a *majority* of the stockholders of a company cannot make, either without or with the assent of the Legislature. Any one stockholder in either company may, of his own motion, and at his option, prevent it, unless the power be in the charter, or be assented to by all the stockholders. In every charter, there is first the contract between the company and the public, and second, the contract between the stockholders themselves. The leading idea of the latter contract is, that the majority may make every contract and do every act authorized by the charter, and no more. If it be desirable to get new powers inserted into the charter, all the corporators must assent to it. A subscriber who has taken stock in one enterprise, does not agree that the majority shall, even with the legislative assent, divert his funds to a new and different enterprise against his consent. And this I understand to be the settled rule of all the Courts, both in England and America. But it is replied, that admitting this to be the law, the argument before the Court is for the lease, and the contract to manage the companies is not a part of the lease; that in fact, it contemplates, on its completion, that the lease shall be merged into it; that it is an independent affair, and even if not itself within the power of the majority, that it does not affect this lease. I do not think so. The *consideration* of the lease is stated to be the *mutual covenants* of the parties, and one of these covenants is this agreement. Who shall say that one of the leading motives of those who have assented to the lease, was not that, as soon as the Legislature consented, the two roads should be merged? And without doubt, *under this contract,* if the Legislature does consent, either of the contracting parties can compel the other to con-

sent to this merger.    If this be so, then the contract now entered into is a contract of merger, and in my judgment, must have the assent of all the stockholders.    At any rate, any one may dissent and break it up.

I think the State a proper party to this bill.    As a matter of course, if the companies have the right to make the contract, the bill is not a good bill in the name of any body. If, however, this contract is contrary to the charter—an assertion of a franchise not granted to the company—then the attempt to make it is contrary to law, contrary to public policy, and the State has a right to be a party, either under its general power to prevent violations of the law, or by virtue of its interests in the Macon and Brunswick road.

The bill is filed on this idea, that the companies are violating their *charter*, not only infringing on the rights of the dissenting stockholders, but violating the public law, to-wit: setting up a chartered right that belongs to neither road.   I think, therefore, the State was a proper party if the bill was good, and as I think the bill *was good*, I think the State a proper party.